No. 31,447

THE SINCLAIR REFINING COMPANY, *Appellee*, v. LAURA E. LONG and RUTH L. DARY, as Executrices of the Estate of A. W. Long, Deceased; THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, THE PENN MUTUAL LIFE INSURANCE COMPANY, and THE ÆTNA LIFE INSURANCE COMPANY, *Appellants*.

(32 P. 2d 464.)

Opinion filed May 17, 1934.

*Ira C. Snyder*, of Manhattan, *A. E. Crane, A. Harry Crane*, both of Topeka, *C. Vincent Jones, W. T. Roche*, both of Clay Center, and *William Ritchie*, of Omaha, Neb., for the appellants.

· R. P. Evans, George Clammer, Hal E. Harlan, A. M. Johnston, all of Manhattan, Walter E. Brown and Roger B. Jones, both of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This appeal presents a controversy between rival claimants to the proceeds of four life insurance policies, of the aggregate face value of $100,000, issued by three life insurance companies on the life of A. W. Long, in which the Long Oil Company, a corporation, was named beneficiary. The insured died February 19, 1932. His widow, Laura E. Long, and his daughter, Ruth L. Dary, executrices of his will and beneficiaries named therein, promptly notified the insurance companies that they claimed the proceeds of the policies. The Long Oil Company sued on the policies, bringing three actions, one against each of the insurance companies. Proceeding under our statute (R. S. 60-418), the insurance companies filed affidavits in which they admitted liability on the policies and asked to be permitted to pay the money into court; they stated the insured's executrices were claiming the proceeds, and asked that they be made parties to the action and substituted as defendants. These requests were granted. The net proceeds of the policies, $83,496.05, being their face value less the amount of loans previously made to the Long Oil Company thereon, was paid into court, where it has been properly impounded pending the outcome of the action. Thereafter the Sinclair Refining Company, having purchased the assets and assumed the liabilities of the Long Oil Company, was substituted as plaintiff in each case. The defendants, Laura E. Long and Ruth L. Dary, as executrices of the will of A. W. Long, by answer and cross petition, set up their claims to the proceeds of the policies, which claims, shortly stated, are: (1) That the Long Oil Company had no insurable interest in the life of A. W. Long, and for that reason is not entitled to the proceeds of the policies; and (2) that under an oral agreement between the insured and the Long Oil Company the executrices were entitled to the proceeds of the policies, less premiums paid by the Long Oil Company with interest thereon, notwithstanding the fact that the Long Oil Company was named in the policies as the sole beneficiary. Issues were properly joined, and by stipulation the three actions were consolidated and tried as one. The defendants voluntarily assumed the burden of proof, and, at the close of their evidence, the

court sustained plaintiff's demurrer thereto and rendered judgment for plaintiff. Defendants' motion for a new trial was overruled, and they have appealed.

The facts may be stated as follows: In 1914 A. W. Long began the operation of an oil station at Manhattan. The business appears to have prospered for a time. He acquired and operated three or four other stations, and in 1917 incorporated the business in the name of the Long Oil Company, with a capital stock of $25,000, "to engage in the mercantile business, buying and selling oil, gasoline, auto accessories and other articles of merchandise in connection therewith." The capital stock was increased to $50,000 in 1919, and $100,000 preferred stock was added to the capital in 1920. In 1926, on an appraisal of the corporation's assets, a 400 per cent stock dividend was declared and the capital stock was increased to $250,-000 common and $200,000 preferred. In December, 1926, the preferred stock was increased to $450,000, and in April, 1930, to $650,000, and the company then owned and operated more than seventy-five oil stations, but was borrowing substantial sums. Upon the increases of the capital stock in 1926, and subsequently, extensive stock-selling campaigns were inaugurated and carried on, to direct which a man capable and experienced in that business was employed. On February 20, 1931, its board of directors authorized and directed its officers to take such action as may be necessary "to secure the release and discharge of any of its property and assets, including life insurance policies, heretofore pledged in any manner as security on any outstanding note or account," and further authorized and directed its president and secretary, on behalf of the company, to execute and deliver to L. R. Crawford, trustee, a promissory note for $200,000, due in six months, bearing interest at six per cent per annum, all in pursuance of a contract of February 4, 1931, between the company and said trustee. The bills payable and accounts then due and listed amounted to $172,960.46, which list did not include sums borrowed on the life insurance policies. A. W. Long owned the majority of the common stock of the company, was its president and general manager from the organization of the corporation until in March, 1931, when he lost control of it, and ceased to be an officer or employee of the company on May 31, 1931. It was essentially a one-man company. All the years he was president and general manager of the company A. W. Long directed, controlled, and in a sense dominated its business ac-

tivities, with members of his family, other relatives, employees, or personal friends, being on the board of directors, which board appears not to have met often.

The provisions of the four policies sued upon and their history, so far as here pertinent, are as follows: Policy No. 1355307, in corporate form, for $20,000, issued by the Northwestern Mutual Life Insurance Company upon the life of A. W. Long, was dated November 21, 1927. The beneficiary named therein was "The Long Oil Company, the beneficiary, its successors or assigns; a corporation organized under the laws of the state of Kansas, and of which the insured is president." An entry on the face of the policy reads:

"It is agreed that this policy shall belong to and be under the control and disposition of the beneficiary corporation without the consent of the insured."

Other provisions of the policy made it clear that dividends and cash-surrender value were payable to the beneficiary named without the consent or participation of the insured, and that the beneficiary also had full control of all options or other benefits provided for in the policy. It also contained a marginal entry as follows:

"This policy is issued and accepted in lieu of personal form policy of like number, duly surrendered, and its provisions shall be construed as of the date of the original policy, September 6, 1919."

On the date last mentioned the insurance company had issued a policy of the same number and amount on the life of A. W. Long in which the beneficiary named was the "executors, administrators, or assigns" of the insured and in which he had reserved the right to change beneficiaries. On March 17, 1926, A. W. Long assigned "all my right, title and interest in" this policy "unto the Long Oil Company, . . . its successors and assigns, as their interest may appear." This is the policy which was duly surrendered when the policy sued upon was issued, November 21, 1927. It appears the reason the old policy was taken up and the new one issued is stated in a letter of the assistant secretary of the insurance company under date of October 26, 1927, referring to policies Nos. 1355307 and 1855863, which states:

"Under date of March 17, 1926, the policies were assigned on the creditor form to the Long Oil Company, Manhattan, Kansas, as their interest may appear. Mr. Anderson in his letter states that the policies are 'to be made payable specifically to the Long Oil Company with one specific provision, in case the company should owe him personally any money at his death said amount be paid out of the proceeds of the policies and the remainder to the Long Oil Company." From this statement it appears doubtful whether the

creditor form of assignment is adequate protection for the corporation. We rather believe that the insurance should be reissued on the special corporation forms of contract payable to the Long Oil Company, its successors or assigns, as beneficiary, and then have the corporation assign the policies to the insured as his interest may appear. . . ."

This is what was done: On November 19, 1927, the board of directors of the Long Oil Company adopted a resolution that the "corporation assign its policies Nos. 1355307 and 1855863 of the Northwestern Mutual Life Insurance Company payable to this corporation as beneficiary to Archie W. Long as collateral security," and authorizing the president and secretary to execute such assignment as might be necessary. On the date the policy sued upon was issued, November 21, 1927, it was assigned by "the Long Oil Company, by A. W. Long, president; C. T. Gist, secretary," unto "A. W. Long, . . . his successors, administrators and assigns, as his interest may appear." This assignment was made to indemnify A. W. Long because of certain notes he had signed for money borrowed for the use of the Long Oil Company. On April 18, 1931, A. W. Long executed the following:

"RELEASE OF INTEREST

"The consideration for which policy No. 1355307 . . . was assigned to me having been fully satisfied and discharged, I, being of legal age, hereby release and reassign all right, title and interest in said policy."

On March 5, 1930, the board of directors of the Long Oil Company adopted a resolution authorizing and directing its officers to borrow from the Northwestern Mutual Life Insurance Company upon its two policies, describing them, "on the life of Archie W. Long, payable to this corporation, its successors and assigns, the beneficiary, the sum of $11,844." This was done, and the loan had not been repaid at the time of the death of A. W. Long.

The second policy sued upon, No. 1855863, in corporate form, for $30,000, was issued by the Northwestern Mutual Life Insurance Company on the life of A. W. Long on October 9, 1928, and was made payable to "the Long Oil Company, the beneficiary, its successors or assigns, a corporation organized under the laws of the state of Kansas, and of which the insured is president." Its various options were to be exercised by the beneficiary, and its cash-surrender value was payable to the beneficiary. It contains no provision authorizing the insured to change the beneficiary, and, among other things, states: "This policy, and the application therefor, constitute the entire contract between the parties." It was issued upon

the surrender of a five-year term policy of the same number and amount issued September 17, 1925. On March 17, 1926, A. W. Long assigned all his right, title and interest in this term policy unto the Long Oil Company, its successors or assigns, as their interests may appear. On November 21, 1927, the Long Oil Company, by A. W. Long, its president, and C. T. Gist, its secretary, assigned all its rights, title and interest in this policy to A. W. Long to secure him for having signed certain notes for the Long Oil Company, "the remainder of said policy, if any, being unaffected by this assignment." On February 20, 1931, A. W. Long reassigned this policy to the Long Oil Company; but it appears the Long Oil Company had the policy back before that time, for on October 20, 1928, its board of directors, by resolution, authorized its officers to borrow from the insurance company upon its "policy No. 1855863 on the life of Archie W. Long, payable to this corporation, its successors or assigns, as beneficiary, the sum of $3,790." This was done. This policy loan was increased March 1, 1930, and was unpaid at the time of the death of A. W. Long.

The third policy sued upon, No. P598196, in corporate form, for $25,000, was issued on the life of A. W. Long by the Ætna Life Insurance Company, February 23, 1927, pursuant to a resolution, adopted January 25, 1927, by the board of directors of the Long Oil Company that "an additional $25,000 life insurance policy be taken out by the president in favor of the company." The application was signed both by A. W. Long and by the Long Oil Company, and in it the Long Oil Company agreed to pay the premiums. The beneficiary named therein was "the Long Oil Company, Manhattan, Kansas, its successors or assigns." Authority to change the beneficiary was not reserved in the insured. Among other things the policy provided:

"During the lifetime of the insured the right to receive all cash values, loans, dividends and other benefits accruing hereunder, to exercise all options and privileges described herein and to agree with the company to any change in or amendment to this policy shall vest alone in the Long Oil Company, Manhattan, Kansas, its successors or assigns."

On February 7, 1930, the Long Oil Company, by A. W. Long, president, and C. T. Gist, secretary, executed a collateral security agreement by which it assigned this policy to A. W. Long to secure him certain notes he had signed on behalf of the Long Oil Company. This instrument, among other things, contained a warranty that the Long Oil Company "is the sole and absolute owner of said policy."

On March 17, 1930, A. W. Long executed a release and relinquishment of that assignment, which recited "that the consideration for which such assignment was made has been satisfied and said assignee, who is now of legal age, hereby relinquishes all interest in said policy." On March 5, 1930, the board of directors of the Long Oil Company adopted a resolution authorizing and directing its officers to borrow from the Ætna Life Insurance Company, upon the security of its policy No. P598196 on the life of Archie W. Long, payable to this corporation, its successors and assigns, as beneficiary, the sum of $1,875. This was done, and the policy loan was unpaid at the time of the death of A. W. Long.

The fourth policy sued upon, No. 1311400, in corporate form, for $25,000, was issued by the Penn Mutual Life Insurance Company on the life of A. W. Long on September 15, 1930, in place of a policy of the same number and amount dated December 22, 1927, which in turn was in place of a policy of the same number and amount issued September 16, 1927, both of which had been properly surrendered and canceled, and for which the new policy had been issued. In the application for the change of the last of these to the policy sued upon, which application was signed both by A. W. Long and by the Long Oil Company, at the top of the application A. W. Long had written this:

"I hereby change the beneficiary of the after mentioned policy and make it payable to my executors, administrators or assigns, if such right be reserved to me. . . ."

The application, however, contained the statement: "The right to change the beneficiary IS NOT reserved to the insured." (Capitals as appear in instrument referred to.) The beneficiary named in the policy sued upon was:

"The Long Oil Co., a corporation, its successors or assigns, for its sole use and benefit which corporation by reason of the death of the insured would suffer a financial loss greater than the amount of this policy, and with full power to said beneficiary to exercise any of the options granted either to the insured or beneficiary, without the consent of the insured or his executors, administrators or assigns. Subject, however, to the assignment dated February 8, 1930, under policy No. 1,311,400, a copy of which assignment is attached."

The assignment mentioned had been executed by the Long Oil Company by A. W. Long, president, and C. T. Gist, secretary, and contained a warranty that the Long Oil Company "is the sole and

absolute owner of said policy," and was made to A. W. Long to secure him for certain notes he had signed for the Long Oil Company.

On February 20, 1931, A. W. Long executed and delivered the following:

"ASSIGNMENT

"In consideration of the sum of one dollar ($1.00), receipt of which is hereby acknowledged, I do hereby assign unto the Long Oil Company all right, title and interest accruing to me, my heirs and assigns, or which may accrue to me by reason of the following life-insurance policies:

| Policy. | Company. | Amount. |
|---|---|---|
| P 598196 | Ætna Life Insurance Co | $25,000.00 |
| P 1311400 | Penn Mutual Life Insurance Co | 25,000.00 |
| P 1355307 | Northwestern Mutual Life Ins. Co | 20,000.00 |
| P 1855863 | Northwestern Mutual Life Ins. Co | 30,000.00" |

The Penn Mutual Life Insurance Company accepted this assignment as a conveyance to the Long Oil Company of all the interest A. W. Long had in its policy No. 1311400 as a collateral assignee.

The Long Oil Company borrowed from the insurance company on this policy, which loan was unpaid at the time of the death of A. W. Long.

Plaintiff alleged that the Long Oil Company had paid the premiums on each of the policies from its inception. Defendants denied this. The evidence showed that the Long Oil Company paid all premiums on the Ætna and the Penn Mutual policies, and all premiums on the two Northwestern policies since the Long Oil Company was first named as beneficiary therein, but the evidence is silent as to who paid premiums prior thereto.

In their amended answer to plaintiff's petition, in the action on the policies issued by the Northwestern Mutual Life Insurance Company, defendants alleged that while A. W. Long was the principal stockholder, president and general manager of the Long Oil Company at the time the policies were reissued in the form sued upon, and while such conditions and business relationships continued to exist, the Long Oil Company had an insurable interest in the life of A. W. Long; that such interest was to indemnify the Long Oil Company against such loss as it might sustain by reason of the death of its principal stockholder, president and general manager; but that on May 31, 1931, plaintiff, of its own volition, terminated A. W. Long's connection with the business of the Long Oil Company and wholly discontinued his services, and from that time until his death, February 19, 1932, A. W. Long had no such con-

nection with the Long Oil Company and was not an officer or employee thereof, nor indebted to it; that the Long Oil Company had no insurable interest in his life after his connection with the company ceased, and that it would be against public policy to permit plaintiff to receive and retain any part of the proceeds of the policy other than the premiums it had paid thereon, with legal interest on such premiums.

As a second principal defense it was alleged in substance that during all the time the original policies held by A. W. Long upon his life were payable to his executors, administrators or assigns, the Long Oil Company was desirous of indemnifying itself against loss which it believed it would suffer if his death should occur while he was its president, director and managing officer, and wished to have the policies which A. W. Long had on his own life to effect that indemnity and strengthen its credit; whereupon it was mutually and orally agreed between A. W. Long and the Long Oil Company that A. W. Long would allow the policies to be taken by the Long Oil Company and reissued upon his life with the Long Oil Company beneficiary, to indemnify it against loss of his services in case he should die while in the employ of the company; and in case his services were terminated before his death the Long Oil Company should keep only the amount of premium it had paid, with the legal interest thereon, and the balance of the proceeds of the policies should belong to the estate of A. W. Long regardless of the written terms of the policies to be reissued; that this oral agreement was wholly between A. W. Long and the Long Oil Company and independent of and contemporaneous with delivery of said original policies to be surrendered; that the oral agreement was renewed and confirmed in like manner and form under the general plan originally made concerning the first policy so assigned, and that each subsequent policy and assignment was taken out or made in pursuance of such general plan, and

". . . that the oral agreement herein referred to and the renewals thereof, were made by A. W. Long personally, with A. W. Long, president and general manager of the Long Oil Company, in the manner and form and under the conditions herein set forth and described . . . that the 'general plan' herein referred to, consisted of an oral arrangement between A. W. Long personally and A. W. Long, president and general manager and chief executive officer of the Long Oil Company whereby A. W. Long should assign his life insurance, which he then carried upon his own life in the Northwestern Mutual Life Insurance Company, payable to his estate, to the Long Oil Company, for the purpose of expanding, enlarging and promoting the business of the

said Long Oil Company, and strengthening its credits and financial standing, and that he would take out other insurance upon his life from time to time, in favor of the Long Oil Company as beneficiary, and that said further or additional insurance was also taken out upon the life of A. W. Long and payable to the Long Oil Company as beneficiary, for the purpose of enlarging and expanding the business of the Long Oil Company, strengthening its credit and financial standing, and all done under the oral agreement as hereinbefore set forth."

It was further alleged that A. W. Long relied upon the oral agreement and fully performed and carried out all the terms thereof, and would not have done so except for the oral agreement; and that plaintiff has received and retains and seeks to hold all the benefits thereof, and that it would be a fraud upon him and his estate to now allow plaintiff to repudiate the same; that the Long Oil Company had knowledge of the oral agreement by reason of the fact that at a meeting of the board of directors, held in 1926, the general plan and oral contract above set out was fully and orally stated and explained by A. W. Long in open board meeting, and that all the details thereof were made known to the board of directors at that time, and that, any assignment made by A. W. Long to the Long Oil Company at any time was made in contemplation of the original plan with reference to insurance as above stated and was not intended to alter or modify the same.

All of these allegations were put in issue by appropriate pleadings.

In support of the allegations of their answer with respect to the contract alleged, defendants produced as a witness Ruth L. Dary, a daughter of A. W. Long, one of the executrices of his will and a beneficiary thereof and one of the directors of the Long Oil Company in 1926, and who attended one of its meetings held on February 4, 1926. With respect to what was said about insurance policies at that meeting she testified:

"A. My father said he had two policies in the Northwestern Mutual Life Insurance Company that he was going to transfer to the Long Oil Company; that he wanted to kill two birds with one stone. . . . My father said that he wanted to protect his company in so far as he could and also protect his estate; that he had made the agreement with his company that he was transferring these policies with the understanding that if he died while in their service the company would receive the insurance; but in the event that he was no longer in the service of the company and he passed away, the insurance could be collected by the company, taking out all the premiums they had paid and the balance could be paid to his estate. He thought this was only fair, he said, to his company and to his home; that the premiums, he said, could

be paid on this insurance; and this would be a good investment for the company. . . . My father said, too, that he hoped in the near future to take out more life insurance for the company with the same understanding. That is all I remember of the conversation concerning life insurance. . . . I don't remember of any particular person speaking afterwards, but there was nothing negative said concerning it. Some one said, although I don't remember who it was, that they thought it was a good plan of my father's to do this. . . . He stated that the company was to a place where they had to expand more, and by so doing—turning over these two life insurance policies—it would give the company a better credit and a better borrowing power and that was what they needed."

She did not recall what other business was transacted at that meeting.

Defendants next called as a witness Laura E. Long, the widow of A. W. Long, one of the executrices of his will and a beneficiary thereunder, and a director of the Long Oil Company since its organization. She attended a meeting of the board of directors held February 4, 1926, and with respect to what was said about insurance at that meeting she testified:

"Mr. Long stated at the meeting that he was leaving the $20,000 and the $30,000 policies to the Long Oil Company as collateral or better borrowing power, and to make his company bigger in case he wanted to make any more stations or anything like that, they would have money to do it, and as collateral, and in case if he was still president and manager of the Long Oil Company the Long Oil Company would be the beneficiary, but if he died the company was to collect the insurance and take out what they had put in with interest and leave the rest to his estate.

"Q. Just if he died? A. If he died and was not interested in any way or connected with this other company.

"Q. With what company? A. The Prairie Oil—they called it the Long Oil, but I call it the Prairie Oil.

"Q. Did he say the Prairie Oil? A. Well, they called it the Long Oil Company, technically, I suppose.

"Q. Did he say anything with respect to any other insurance? . . . A. Yes, he did.

"Q. State what he said, Mrs. Long. A. He said from time to time he hoped to take out more insurance in the same way to protect his company. . . . In case of his death, as I told you before, that the company would be the beneficiary; if he was still the president, they would be benefited by it, because he wanted to let his company be in good standing if anything had happened to him, and he was still in the company."

The first the "Prairie Oil" company had anything to do with the stock of the Long Oil Company, as shown by the record in this case, was by a contract made by A. W. Long in February, 1931, with L. R.

Crawford, trustee. How Mr. Long could have stated anything about that to the board of directors on February 4, 1926, is not disclosed.

The minutes of the meeting of the board of directors of the Long Oil Company held on February 4, 1926, read as follows:

"MANHATTAN, KAN., Feb. 4, 1926.

"The directors of the Long Oil Co. met Thursday, February 4, 1926, at the call of the president, with the following present: A. W. Long, L. E. Long, Ruth Long & C. T. Gist.

"Moved by C. T. Gist, and seconded by L. E. Long, that in accordance with the resolution adopted by the stockholders at the annual meeting held Tuesday, January 26, 1926, a stock dividend of 400 per cent be declared. Motion carried unanimously.

"The board of directors then adjourned.          C. T. GIST, Sec'y."

Defendant also called as a witness the man employed by the Long Oil Company who had charge of its stock-selling campaign in 1926 and 1927. He was employed for that purpose by A. W. Long, president of the Long Oil Company, in the spring of 1926. He had a discussion with Mr. Long concerning the financial condition of the company and the promotion and sale of its stock during which Mr. Long acquainted him with the financial condition of the company. On being asked whether Mr. Long said anything about life insurance which the company had, or would have, witness testified:

"A. Yes. He said, 'I have arranged,' or 'I expect to arrange,' but my best recollection is that he said, 'I have arranged to transfer $50,000 of insurance heretofore made out in favor of my estate to the Long Oil Company for the protection of the stockholders, but if for any reason I sever my connection with the company this insurance will revert to my estate, and on my death will be paid to my estate, less any premiums paid by the company on these policies while it is the policyholder, or while the company is the beneficiary.' He also said, 'And I intend to take out additional life insurance in the future as the company expands under the same arrangement and plan that the present insurance is made over to the company.'"

He further testified that about a year after his first employment, while conferring with Mr. Long about the sale of company stock, Mr. Long stated:

"I have arranged with the board for $25,000 more of insurance the same as the first was made."

And sometime later Mr. Long told the witness:

"We are now carrying $100,000 insurance for the protection of policyholders (stockholders) on my life. . . . As the company grows and expands, I have ambitions to maybe carry a quarter of a million $250,000 worth of life insurance under such arrangement."

On cross-examination he was asked:

"Q. Did you ever tell any stockholders to whom you sold stock . . . that in case Mr. Long left the company's employment the insurance was to go to his family? A. Not in that language.

"Q. Sir? A. Not in that language that you make the question.

"Q. You did not tell them that? A. I did; but not in the language with which you asked the question.

"Q. Did you tell them that if Mr. Long died after severing his connection with the company that these insurance policies were to go to his family? A. No, sir.

"Q. You never told them that. You always offered your stock with this insurance back of it as going to the company, did you not? A. Yes."

Another witness called by defendants was an attendant at one of the oil stations in Manhattan. Mr. Long, president of the Long Oil Company, had asked the witness to interest people in the shares of stock. The witness owned ten shares of common stock, and Mr. Long told him something of the financial condition of the company in the spring of 1926 and among other things told the witness:

". . . that he had turned over $50,000 worth of life insurance that had been made payable to his estate to the Long Oil Company for the protection of the stockholders as long as he was connected with the company, but if at any time he was not connected with the company, at his death the insurance reverted back to the estate."

The witness never made any sales of stock, but he talked to different persons about it and remembers telling one that he thought the stock a good investment and that it was protected by the insurance of Mr. Long as long as he was president of the company. Perhaps some of the persons he talked to bought stock, but if so they went to the office of the company, or elsewhere, and made their purchases.

The testimony of these last two witnesses was objected to on the ground that it was incompetent and self-serving and not binding on plaintiffs.

Another witness called by defendant was an attorney representing certain stockholders at a directors' meeting of the Long Oil Company, held March 24, 1931, where a question arose. as to the advisability of retaining Mr. Long in the service of the company in the event the contract for the sale of its stock made between him and L. R. Crawford, trustee, in February of that year was carried out. There was some discussion about these insurance policies, whether to pay premiums and carry them, or to take their cash-surrender value. Witness asked if the company had an insurable

interest under the circumstances. Someone answered, "Yes, it does." Someone, perhaps Mr. Gist, stated that there was some slight question as to whether the company was entitled to the policies.

Nowhere in the minutes of the board of directors, or other records or files of the Long Oil Company, was shown any record of the oral agreement relied upon by defendants, but, on the other hand, all such records pertaining in any way to insurance, or to these insurance policies, are in harmony with the view, shown by the policies themselves, that the Long Oil Company was sole beneficiary in the event of the death of the insured, and had sole right to all benefits and to exercise all options of the policies. During the more than eight months A. W. Long lived after his services with the Long Oil Company ceased he made no contention to the contrary.

Turning now to the legal questions argued. The first of these is that of insurable interest. It is alleged in the answers and conceded in the briefs that the Long Oil Company had an insurable interest in the life of A. W. Long when the policies were assigned or issued to it as beneficiary, because he was then its president and general manager as well as its majority stockholder; and it is further conceded that such insurable interest continued as long as he retained that relation to the company. This accords with the authorities (*U. S. v. Supplee-Biddle Co.*, 265 U. S. 189, 195, and other cases collected in the annotation, 75 A. L. R. 1362). But it is contended by defendants when A. W. Long's connection with the Long Oil Company ceased such insurable interest ceased. It is argued that the reason the corporation had an insurable interest in Long's life while he was its officer or employee is that it would sustain a loss by his death while in that position, and that when his services with the company ceased this reason no longer existed; that contracts of this kind are indemnifying contracts designed to indemnify the corporation for the loss of an official or employee, and if the insured does not sustain such relation to the corporation there can be no such loss and hence nothing to indemnify.

Although this specific question was not then under consideration by the court, some support is given to this view by a sentence in *U. S. v. Supplee-Biddle Co.*, supra, where it was said: "Life insurance in such a case is like that of fire and marine insurance, a contract of indemnity," citing *Washington Central Bank v. Hume*, 128 U. S. 195. But if the cited case is examined it will be seen that term is used in a very limited sense.

In *Home Title Ins. Co. v. United States*, 50 F. 2d 107, 109, it was said:

"Speaking generally, it may be said that a contract of insurance is a contract of indemnity, and many authorities might be cited containing statements to this effect (citing *United States v. Supplee-Biddle Co.*, 265 U. S. 189, and other cases). The statement is true if it means that the insured must have some interest at risk, for otherwise the contract is a wager; but it is not true if construed to mean that the insured can never collect from the insurer more than his actual loss, . . . or that the insured must first salvage what he can and then look to the insurer only for the difference."

But in none of the three cases last cited was the question here presented before the court, and what was there said about an insurance contract being a contract of indemnity was general in its terms and has in fact no application to the specific question before us. As applied to the situation here presented, the authorities generally are, and the recent ones practically unanimous, that the policy is not a mere contract of indemnity, but is a contract to pay to the beneficiary a certain sum in the event of the death of the insured. The authorities are practically unanimous also in support of the rule that where the insurable interest exists when the policy is issued, and a valid contract of insurance is then effected, it is not defeated by the cessation of the insurable interest unless the terms of the policy so provide. We quote from some of the leading authorities on this question:

In *Grigsby v. Russell*, 222 U. S. 149, it was held:

"A valid policy of insurance is not avoided by a cessation of insurable interest even as against the insurer unless so provided by the policy itself."

In *Conn. Mut. Life Ins. Co. v. Schaefer*, 94 U. S. 457, it was held:

"A policy of life insurance originally valid does not cease to be so by the cessation of the assured party's interest in the life insured, unless such be the necessary effect of the provisions of the instrument itself."

In *Wurzburg v. N. Y. Life Ins. Co.*, 140 Tenn. 59, 203 S. W. 332, it was held:

"A manufacturing company has an insurable interest in the life of its manager, who is its guiding spirit and is largely carrying on its business.

"Where a manufacturing company took out a valid policy on the life of its general manager, who later severed his connection with the company, and it paid all premiums until his death, it was entitled to the whole of the insurance."

In the opinion it was said:

"This is true because a policy of life insurance is not now held to be a mere contract of indemnity, but is a contract to pay the beneficiary a certain

sum of money in the event of death. . . . It follows that if a policy is valid when issued, and remains valid until the death of the insured, the beneficiary is entitled to the whole of the insurance." (p. 65.)

In *Wellhouse v. United Paper Co.*, 29 F. 2d 886, it was held:

"Firm of which insured was one of principal stockholders, and of which he was vice president and principal executive officer, had an insurable interest in his life. 'A policy of life insurance originally valid does not cease to be so by cessation of beneficiary's interest in life of insured unless so provided in policy itself.'" (Citing 94 U. S. 457; 222 U. S. 149.)

In *Keckley v. Glass Co.*, 86 Ohio St. 213, 99 N. E. 299, it was held:

"A life insurance policy is not merely a contract of indemnity. It is a contract to pay to the beneficiary a sum certain in the event of death; . . .

"Where a person is the owner of a large portion of the stock of a corporation, and by reason of his skill and experience he is largely relied upon to make the business of the corporation a success, and when, in borrowing money of banks and in dealing with creditors, and inducing other persons to buy stock in such corporation, he represents that he has insured his life for the benefit of the corporation and that the policies therefor are assets of the corporation, such facts disclose an insurable interest in the corporation; and such insured person and his legal representatives are estopped from claiming that such policies are not based upon an insurable interest, or that the amounts due thereon do not belong to the corporation."

In *West End Sav. Bank v. Goodwin et al.*, 223 Ala. 185, 135 So. 161, it was held:

"Bank has insurable interest in life of president, director, and stockholder, and his resignation does not affect validity of policy for benefit of beneficiary bank."

In *Reilly v. Penn Mut. Life Ins. Co.*, 201 Ia. 555, 207 N. W. 583, it was held:

"A corporation which, for its own general benefit, is the beneficiary in a policy of life insurance on the life of one of its officers, is unconditionally entitled to the proceeds of the policy, even though the insured had, at the time of his death, severed his *official* relation with the corporation."

In *Nat. Bank v. Lumber Co.*, 163 Miss. 691, 141 So. 767, it was said:

" 'Life insurance policy' is contract to pay specific sum on death of insured without regard to value of his life to beneficiary.

"Corporation had insurable interest in life of one who was treasurer and active manager when policy was issued.

"That beneficiary's interest in insured's life ceased after a policy was issued had no effect upon validity of policy or on beneficiary's right to proceeds."

Reason as well as authority supports this view. These policies were taken in the form they were, and premium paid by the Long

Oil Company, to increase and stabilize its financial standing; give it greater borrowing power—and much money was borrowed—and to enable it to sell its new issues of stock, and as an inducement for them to purchase, prospective purchasers were told that the corporation was the sole beneficiary. Is it possible that the financial stability of the corporation could be wrecked by the simple process of the insured resigning from the company? Obviously such a holding would be grossly unfair to creditors and stockholders. These policies were in no sense wagering contracts when made, nor did they become so by the fact that A. W. Long ceased to be an officer or employee of the corporation. The corporation, as the named beneficiary in the policies, which provided the insured had no right to change the beneficiary, had a vested interest in the policies, and the benefits named therein (*Filley v. Insurance Co.*, 91 Kan. 220, 137 Pac. 793; 93 Kan. 193, 197, 144 Pac. 257, and authorities in annotation, 52 A. L. R. 386, 401), which could not be defeated by the cessation of A. W. Long's connection with the company.

Let us now turn to the oral contract pleaded by defendants and the evidence offered in support of it. This in effect was that the provisions of the policies making the Long Oil Company sole beneciary and entitled to all the rights and privileges mentioned therein, and specifically denying to the insured the right to change the beneficiary, were not what they purported to be on their face; that one reading the policies and all the records of the Long Oil Company, including the minutes of its board of directors and the records of the insurance companies pertaining to these policies, could not understand what they meant. There is no specific request here that the policies be reformed, but the position is that the oral contract operated to change the beneficiary of the policies in the event A. W. Long ceased to be an officer or employee of the company. It requires no authorities to sustain the view that a contention so sinuous and attenuated requires clear and convincing proof.

Defendants' claims are predicated upon an alleged oral contract between A. W. Long and the Long Oil Company that the two Northwestern Mutual policies should be assigned to, and the Ætna and Penn Mutual policies should be taken out in the name of, the Long Oil Company as sole beneficiary, which beneficiary the insured could not change, with the understanding that if Mr. Long should die while in the employ of the corporation it should retain the full proceeds of the policies, but if his connection and services with the

corporation ceased before his death the corporation should retain from the proceeds of the policies only the amount of premiums it had paid, with interest on such premiums, and the balance of such proceeds should be paid to the estate of A. W. Long. It was alleged in defendants' cross petition that this oral contract was made "by A. W. Long, personally, with A. W. Long, president and general manager of the Long Oil Company." In their brief defendants say this "is merely equivalent to the statement that the mutual intention of the company and of Long, *as evidenced by his mental determination* (italics ours), was expressed orally and not in writing." The evidence primarily relied upon to support this view is the testimony of the witness Ruth L. Dary, one of the defendants, that at the directors' meeting, February 4, 1926, Mr. Long stated "that he had made the arrangement with the company."

We are confronted, therefore, with the question, first: Can an individual, simply by his own mental processes, make an enforceable contract with himself in some other capacity? In 13 C. J. 261 the rule is thus stated:

"Since a person cannot enter into an agreement with himself, nor maintain an action against himself, it follows that two or more parties are essential to every contract. One cannot enter into a contract with himself, or with himself and others, even though he acts in different capacities."

And in the latest authoritative work on the subject by the American Law Institute, in its Restatement of the Law of Contracts, § 15, it is said:

"There must be at least two parties in a contract, but may be any greater number.

"Comment a.: It is not possible under existing law for a man to make a contract with himself. This rule is one of substance and independent of mere procedural requirements. Even though a man has different capacities, as for instance as trustee, as executor, as partner, as an individual, it is impossible, as a matter of substantive law, for him, by his own individual will or expressions, to contract with himself. As will be seen under the following sections, it is another question whether a contract may be formed in which the same person is one of several on one side of a bargain, and either alone or with others a party to the other side. The question is also distinct whether a contract is necessarily discharged where one party becomes both obligor and obligee and there are no other parties to the contract."

We deem the citation of other authorities unnecessary. We feel compelled to hold that the mental operations of Mr. Long, and the testimony relating thereto, relied upon by defendants as constituting an enforceable contract, are wholly insufficient for that purpose.

On this point defendants cite and rely heavily upon the case of *Federal Trust Co. v. Damron*, 124 Neb. 655, 247 N. W. 589. In that case Reynolds, who was the majority stockholder, president, general manager and dominating influence of a trust company, took out a policy of insurance on his own life and personally paid the first premium. The policy vested in him the sole right to exercise all options contained therein, including cash-surrender and loan values and the right to change the beneficiary at will. It designated the trust company as trustee to receive the proceeds of the policy in the event of his death, the insurer not to be bound by the disposition of such proceeds by the trustee. There was then executed a written contract, signed by the insured and by him as president of the trust company, and attested by its secretary, revocable at the option of the insured, providing how the trustee should disburse the proceeds of the policy. This written agreement was changed on two occasions. The last one was submitted to and ratified by the board of directors of the trust company. It provided that the trust company should pay the premium, and out of the proceeds of the policy the trustee should reimburse the trust company for premiums advanced, with interest thereon, and also for any other money it had loaned to the insured, and provided specifically how the remainder of the proceeds should be disbursed by the trustee. The books of the corporation showed this contract and all that had been done under it. The contract was held to be valid. This does not sustain the view that the mental operations alone of the president of the company could form an enforceable contract. Rather it is an example of instances under which it is possible for an official of a corporation to deal with the corporation when it is done openly and no advantage of the corporation is taken. The general rule with respect to such contracts is stated in 14a C. J. 117 thus:

"A director, officer, or agent may not deal or contract on behalf of the corporation with himself as an individual. . . . A director is disqualified from being counted as part of the quorum or from voting as a member of the board in authorizing a contract with himself. There is considerable divergence of views regarding the validity of a contract between a corporation and a director. The validity of such a contract, and whether it is even avoidable, often depends very much upon its nature and terms, the circumstances under which it was made, and who acted for the corporation in the making. Some of the courts take the broad and unqualified view that a director cannot be allowed to make and take contracts with the company of which he is a director. Another view is that a contract between a corporation and its officers is not void *per se*, but is voidable at the option of the corporation or its representative, provided the option is exercised within a reasonable time under all the

circumstances of the case. . . . An officer may deal with a corporation if his acts are open and fair and known to the directors and stockholders; but all dealings between an officer of a corporation and the board of directors must be scrutinized carefully, and, to bind the stockholders, must bear evidence of having been in the interests of the corporation."

Our own decisions are to the effect that such contracts are not necessarily void, but "are subject to the keenest scrutiny" (*Manley v. Mayer*, 68 Kan. 377, 393, 75 Pac. 550), and are voidable as to creditors and other stockholders (*Manley v. Larkin*, 59 Kan. 528, 53 Pac. 859), and that the officer or director will not be permitted to retain any advantage over the corporation by such a contract (*Thomas v. Sweet*, 37 Kan. 183, 14 Pac. 545). Even these decisions are predicated upon a recognizable contract and are not founded upon the mental operations of the single individual. Defendants cite *Barr v. Randall*, 35 Kan. 126, 10 Pac. 515. There an individual had acquired by purchase a tax-sale certificate, which, under the law, entitled the holder to a deed. He held the position of county clerk, and as such officer executed a tax deed to himself individually. This deed was recorded, and through mesne conveyances the title which it purported to convey passed to one who went into possession of the real property and made lasting and valuable improvements. About twenty years after the tax deed was issued a grantee of the owner of the property prior to the issuance of the tax deed brought eject-ment, predicated upon the view that the tax deed was absolutely void. It was held the tax deed was not absolutely void, and further held plaintiff's action was barred by the statute of limitations. There is nothing in that case which tends to hold that an individual can make an enforceable contract simply by his mental operations.

Defendants next contend that an enforceable contract was made between Long individually and the Long Oil Company at the meeting of its board of directors February 4, 1926, and as to this they rely on the testimony of Laura E. Long. Respecting this contention we note that the minutes of the meeting do not show that any business was transacted concerning insurance. After stating that the meeting was at the call of the president, the names of the directors present, that a motion was made and carried to declare a stock dividend of 400 per cent, the minutes recited, "The board of directors then adjourned." This imports a finality with respect to corporate business transacted at the meeting. The secretary of the corporation who prepared the minutes was not called as a witness for defendants, although available, to testify that any corporate business was trans-

acted at the meeting which was not noted in the minutes, and there is no evidence tending to show that fact unless it can be inferred from the testimony of Laura E. Long, previously quoted herein. We fail to see in this testimony a proposition stated by Long individually, on the one hand, to the board of directors of the Long Oil Company, on the other, which was accepted and acted upon by the corporation so as to form a contract. No contract so created was pleaded in the answer and cross petition of defendants. As heretofore pointed out, the contract pleaded was the prior mental operations of Mr. Long, sought to be evidenced by the testimony of the daughter, Ruth L. Dary, and which we have hereinbefore concluded was ineffectual. About all this testimony establishes is that there was some discussion about plans with reference to insurance not sufficiently mature to be embodied into a contract at that time, and no action proposed or taken having the effect of embodying it into a contract. The testimony discloses that the plan under consideration was to increase the borrowing power of the corporation, to make the company bigger, and in case it wanted more oil stations or otherwise to expand that it would have something in the insurance policies as a basis for that purpose. So far as the talk of Mr. Long with regard to future insurance is concerned, it could be nothing more than the expression of an intention or plan. If any plan such as was pleaded, and such as the evidence tends to show, was ever in mind, the evidence distinctly shows that it never was carried out, for no intimation of it is found when the two Northwestern policies were issued in corporate form in November, 1927. The purpose of changing them to corporate form, outside of what was shown by the policies themselves, is indicated by a letter offered in evidence by defendants which expressed the purpose—

". . . that the policies are 'to be made payable specifically to the Long Oil Company with one specific provision, in case the company should owe him personally any money at his death said amount be paid out of the proceeds of the policies and the remainder to the Long Oil Company.' "

There is nothing in the action taken, or in the reasons given for it at the time the policies were reissued in corporate form, which tends to show that any intention which Mr. Long may have had at any time previous to the effect that the Long Oil Company was not to receive the full proceeds of the policies in the event he was not connected with the corporation at the time of his death, was carried out. In other words, if Mr. Long ever had such intentions, the

evidence introduced by defendants in this case discloses that they were abandoned before or at the time the policies were so reissued; also, if he ever had any such intentions with respect to the Ætna and the Penn Mutual policies, such intentions were abandoned or not carried out when the policies were in fact issued.

Respecting the testimony of the person employed to conduct the stock-selling campaign, and of the oil-station attendant, and with respect to what Mr. Long told them about these insurance policies, it is sufficient to say that Mr. Long could not make a binding contract with the corporation by such statements, nor could he decrease the assets of the corporation or take from it a part of its assets by such statements. In this connection it appears that persons to whom stock was sold, even prospective purchasers of stock, were told the corporation had these policies as part of its assets and as indicating its financial stability, and were not told that such assets would be lost if Mr. Long should sever his connection with the corporation. Mr. Long and the members of his immediate family never, at any time, owned more than fifty-five per cent of the stock; at least forty-five per cent of it was owned by others who knew nothing of this purported arrangement. There is nothing in this case to indicate that creditors knew anything of it. When this stock was finally being sold to the Prairie Oil Company, under the contract with L. R. Crawford, to avoid any possibility that there might be any latent or unknown claims by Mr. Long with respect to these policies, he was asked to and did execute an instrument respecting all of them to the effect that he had no such interest or claim. The policies on their face, the records of the Long Oil Company, and of each of the insurance companies, showed them to be assets of the Long Oil Company. Purchasers of the stock purchased with this definite understanding, and on the specific representation and assurance of A. W. Long that he, his executors and administrators had no interest in them. If there were nothing else in this case to show their lack of interest in the policies defendants are now estopped, under the circumstances, from claiming such interest. But we need not rely on estoppel in this case; it is sufficient to hold, as we do, that the contract relied on by defendants is not supported either by the pleadings or by the proof.

At the trial several questions were raised and exhaustively argued respecting the admission of evidence offered by defendants. The

questions are again stated and argued in the briefs on this appeal. We pass these questions without decision for the reason that whether they were correctly ruled upon or not in the trial court, the court admitted the evidence hereinbefore recited, and having admitted it is presumed, under our rules, to have considered it (Rule 36), since the record discloses nothing to indicate that it did not do so. As the appeal comes to us plaintiff is in no position to raise questions on the admission of such evidence, since it filed no motion for a new trial and has filed no cross appeal. We have therefore considered the evidence as though it were properly admitted. We also have adhered to the rule that in passing on a demurrer to evidence the court cannot weigh conflicting testimony, but should give to it all inferences which reasonably can be drawn from it.

Defendants contend that certain evidence offered at the trial was improperly excluded, and on the hearing of their motion for a new trial the excluded evidence was embodied in an affidavit of Ruth L. Dary and was to this effect: That at some time during the fall or winter of 1925 she overheard a conversation between her father and mother in which her father, A. W. Long, stated to her mother, Laura E. Long, in effect that he had in mind to enlarge the Long Oil Company and add stations on the new Kansas highways; that to do this it would be necessary to sell preferred stock; that he had $50,000 insurance in the Northwestern Mutual Life Insurance Company "which I intend to transfer" to the Long Oil Company, with the understanding that the company would get the proceeds in the event he died while in its service, otherwise to get only premiums paid, with interest thereon, the balance to go to his estate; and as the sales of stock increased to increase that insurance to $100,000 on the same terms. This evidence was properly excluded as indicating only an intention, which, if entertained at that time, was not carried out, as shown by what was actually done when the policies were transferred to the corporation and when new policies were taken out.

We find no error in the record. The judgment of the court below is affirmed.

JOHNSTON, C. J., not sitting.