(74 P.3d 46)
No. 88,955

In the Matter of the Marriage of BONNY JEAN DAY, *Appellee,* and ROBERT ALLEN DAY, *Appellant,* and M. DARLENE DAY and DAY FARMS PARTNERSHIP, *Third-Party Respondents/Appellees.*

Opinion filed July 18, 2003.

*Allen Shelton,* of Shelton Law Firm, P.A., of Oberlin, for appellant.

*Daniel C. Walter,* of Ryan, Walter & McClymont, Chtd., of Norton, for appellee.

*Tony A. Potter,* of Hill City, for third-party respondents/appellees.

Before KNUDSON, P.J., LARSON, S.J., and NUSS, Justice.

LARSON, J.: In this contested divorce, the husband, Robert Allen Day, appeals the trial court's rulings (1) ordering him to maintain two policies of insurance on his mother's life and upon her death to pay part of the insurance proceeds to his former wife, Bonny Jean Day, (2) determining he had constructive control of livestock owned by two sons of the parties' marriage, resulting in erroneous division of the property and debts of the parties, and (3) ordering him to pay wife maintenance of $311 per month for a period of 120 months.

The record is extensive. Therefore, we will highly summarize the proceedings and later set forth in detail the testimony and exhibits that relate to the three contested issues on appeal.

The parties were married in 1973 and primarily worked on the husband's parents' family farm until 1996. Both parties are currently employed with the Rural Telephone Company of Lenora. In 1998 husband began to get back into farming. Wife objected.

Six children were born to the marriage. Two were minors when the present action was tried although one obtained majority in April 2003. The parties agreed on joint custody with the wife having residential custody. There is no dispute before us concerning child support.

The divorce action was filed by the wife in September 2000. Robert's mother, Darlene Day, and Day Farms Partnership were added as parties in July 2001 with Bonny contending she was entitled to an interest in the ownership of real estate and partnership assets. Considerable trial testimony and many of the exhibits related to the wife's claim against Darlene and the partnership, which was ultimately denied by the trial court and that decision was not appealed by the wife.

The parties were granted a divorce in January 2002 with issues of maintenance and property division tried over 2 days in early February 2002. The trial court's extensive memorandum decision was issued shortly thereafter. Each party filed motions to alter or amend the court's judgment which were heard in March 2002, with an order thereon issued in early April granting some of the motions and denying others. Robert timely appeals from those orders. Darlene has not filed an appeal but joins Robert's arguments concerning his issue relating to the insurance policy or policies on her life.

We first consider Robert's arguments that the trial court erred in its order with respect to policies of life insurance insuring the life of his mother, Darlene Day, the premiums for which had been paid during their marriage by the funds of Robert and Bonny. Robert argues it was reversible error (1) to in effect assign a portion of the death benefits to Bonny, who has no insurable interest in Darlene's life, over his objection and that of his mother, (2) to value the policies at their face amounts, and (3) to order husband to

continue the policies in effect and pay all future premiums, thereby requiring him to pay an unknown amount for an indeterminate time.

The record reflects there was a $100,000 whole life policy taken out on the mother's life with Robert as the beneficiary in 1985. When asked about the policy, Bonny testified: "We started, in 1985, carrying life insurance on her when the bank said that we needed to be able to cover, so we could cover some of the debt." When asked who had been paying the premiums, Bonny replied: "Well, the farm was supposed to, but they may have made three or four payments, but the rest has all been out of our personal."

Bonny recognized the policy had no cash value, stated Bob's mother was 79 or 80 at the time of the trial, and when asked why she should be awarded the policy, said, "Because I looked at that as a form of our retirement, because for farming for the 26 years that we were farming together, there was no retirement of any kind, and so therefore, I have no retirement of any kind for 26 years."

Darlene's testimony concerning the insurance coverage came from the deposition and when asked about the reason for taking out the policy, Darlene answered: "Well, I guess so that the farm could be held together when I was gone. We'd been through a whale of wallop in 1980 [apparently in reference to estate taxes upon her husband's death] and I'd hoped that next time around things wouldn't have to be ripped apart."

Robert's testimony concerning the life insurance indicated there was a $10,000 policy that might have a little cash value and then a $90,000 term policy. The premiums at the time of the trial were running $355 per month and scheduled to increase at his mother's birthday on March 15th. When asked, "Are you sure you're going to be able to pay those premiums, Bob?" he answered, "No." But, he asked the court to set the insurance aside to him at this time.

The record reflects that apparently the whole life policy became too expensive in 1996, and it was converted into a $10,000 policy with a $90,000 term rider. Exhibit No. 25 shows policy No. L00302869 issued February 20, 1996, with a $10,000 all life-select class, maturity date of February 20, 2022, and an initial annual premium of $872.90 payable for 26 years. It shows an additional

yearly renewable term insurance benefit of $90,000, annually renewable on February 20, 1997, and an initial annual premium of $1,845.90. Although Bonny argues there was no testimony concerning the amounts of the premium increases, page 5A of the policy shows the following:

"ANNUAL PREMIUM SCHEDULE
GUARANTEED MAXIMUM PREMIUMS AS ISSUED

| MO/DA/YR | PREMIUM |
|---|---|
| 02/20/1997 | $ 4,158.80 |
| 02/20/1998 | $ 4,574.60 |
| 02/20/1999 | $ 5,021.00 |
| 02/20/2000 | $ 5,498.00 |
| 02/20/2001 | $ 6,019.10 |
| 02/20/2002 | $ 6,606.80 |
| 02/20/2003 | $ 7,279.10 |
| 02/20/2004 | $ 8,056.70 |
| 02/20/2005 | $ 8,952.20 |
| 02/20/2006 | $ 9,944.90 |
| 02/20/2007 | $11,032.10 |
| 02/20/2008 | $12,194.00 |
| 02/20/2009 | $13,437.80 |
| 02/20/2010 | $14,750.00 |
| 02/20/2011 | $16,150.40 |
| 02/20/2012 | $17,636.30 |
| 02/20/2013 | $19,238.30 |
| 02/20/2014 | $21,000.50 |
| 02/20/2015 | $23,008.40 |
| 02/20/2016 | $25,465.40." |

Based on Robert's trial testimony of paying a $355 per month premium, the actual 2001 yearly amount would be $4,260, an amount somewhat less than the guaranteed maximums shown on the policy.

Both parties on their proposed property divisions showed the policies with no (0) value. Husband asked for the policy. Wife proposed that the trial court order husband to continue the policies and pay all the premiums, and, upon Darlene's death, to pay the $100,000 death benefit to wife.

With this information, the trial court made the following order:

"The circumstances presented make it inequitable to allow respondent to retain all the benefits from the life insurance policies insuring M. Darlene Day's life. Respondent is required to preserve his ownership interest in both the $10,000.00 and $90,000.00 face value life insurance policies insuring the life of M. Darlene Day. Respondent is also required to continue paying all premiums necessary to maintain the continued viability of those two policies. Further, respondent is restrained from changing ownership of either policy, borrowing against or otherwise encumbering or reducing the value of those policies in any way. Absent an award of an interest in the proceeds of those life insurance policies, I have not made an equitable division of property. Therefore, I am awarding Petitioner Bonny Day an interest in all distributions or payments made by the issuing companies and associated with those two policies after M. Darlene Day's death. The interest assigned to petitioner is determined by the following formula: [N/D x ($100,000.00 life insurance policy face values + cash value + interest from date of death + all other policy accruals)] = Amount paid by Robert Day to Bonny Day at M. Darlene Day's death."

The order contained the following footnote:

"N = Numerator. The numerator is fixed at 17, the approximate difference between the year closest to the date the divorce was granted [2002] and the year when the Exchange Bank required formalization of the agreement between Robert and Bonny Day and M. Darlene Day. It is also the approximate number of years life insurance payments were made were paid on policies insuring the life of M. Darlene Day during the marital relationship. D = Denominator. The denominator is variable and is the difference between the year of M. Darlene Day's death and 1985."

In addition, in the exhibit to the court's decision dividing the parties' assets and liabilities, the court valued the policy on Darlene's life at $100,000 with $50,000 shown in each of the husband's and the wife's asset columns.

In response to Robert's motion to alter or amend, the court acknowledged Bonny did not have an insurable interest in Darlene's life but found the parties had jointly paid years of premiums and held that no interest in the policies were assigned to Bonny but she was simply awarded an interest in the proceeds of the policies upon Darlene's death.

With this background, we turn to Robert's argument concerning the policy or policies of insurance on his mother's life.

Our standard of review of property distribution in divorce cases was stated in *In re Marriage of Sadecki*, 250 Kan. 5, 13-14, 825

P.2d 108 (1992): "On appeal, the trial court's weighing of statutory factors regarding distribution of property upon divorce will be governed by an abuse of discretion standard." Insofar as we resolve questions of law or interpretation of statutory provisions, our review is unlimited. *Babe Houser Motor Co. v. Tetreault*, 270 Kan. 502, 506, 14 P.3d 1149 (2000).

Robert first argues the trial court was correct in finding wife had no insurable interest in Darlene's life but the effect of its decision is to make one with no insurable interest a beneficiary of the policies.

Bonny points out that the question of existence of an insurable interest rests only with the insurance company itself, relying on *Matthews v. Matthews*, 163 Kan. 755, 186 P.2d 233 (1947). In addition, Bonny invokes K.S.A. 40-453(a), the first sentence of which states that the "determination of the existence and extent of the insurable interest under any life insurance policy shall be made at the time the contract of insurance becomes effective but need not exist at the time the loss occurs." The legal effect of the second sentence of K.S.A. 40-453(a), which reads:

"In the case of life insurance policies issued or renewed for a specific term, an insurable interest shall not exist for any policy term with respect to any person, previously insured by the policy who has, in writing, requested the insurer to terminate or nonrenew the insurance applicable to such person's life,"

was argued to the trial court but not commented on in its decision on Robert's motion to alter or amend.

Robert relies on *Insurance Co. v. Elison*, 72 Kan. 199, Syl. ¶ 3, 83 Pac. 410 (1905), where it was held based on the insurer's argument of lack of an insurable interest that

"[a]n agreement by which one-half of the insurance provided for in a life insurance policy was assigned and transferred by the insured and the beneficiary to one having no insurable interest in the life of the insured, upon consideration that the assignee was to pay the premiums as they accrued, contravenes public policy, and neither the assignee nor the beneficiary who participated in the tainted transaction can recover upon the policy."

Although Chief Justice Johnston's opinion is centered on the lack of an insurable interest, the following statement in his opinion gives

a sound argument for questioning the result in our case. The *Elison* opinion states:

"The theory of life-insurance is that one who is interested in the preservation of the life of the insured may safely take and hold insurance, but that insurance in favor of one who has no interest in the life of the insured—who would be interested in his early death—is contrary to good morals and a sound public policy. In the early case of *Life Ins. Co. v. Sturges*, 18 Kan. 93, 26 Am. Rep. 761, it was held that such insurance, if sustained, would open the door to *speculation* and traffic in human life and invite to enter the most shocking of all crimes, and that 'of all wagering contracts, those concerning the lives of human beings should receive the strongest, the most emphatic, and the most persistent condemnation.' The authorities generally unite in holding that one who has no insurable interest can no more take an interest in a policy, valid in its inception, by purchase and assignment than he could by direct issue from the insurer. In *Warnock v. Davis*, 104 U.S. 775, 26 L. Ed. 924, it was said:

'The assignment of a policy to a party not having an insurable interest is as objectionable as the taking out of a policy in his name. . . . If there be any sound reason for holding a policy invalid when taken out by a party who has no interest in the life of the assured, it is difficult to see why that reason is not as cogent and operative against a party taking an assignment of a policy upon the life of a person in which he has no interest.

"It has been said:

'The evil of wager policies would rather be aggravated than otherwise by such a rule, because speculators, desiring to indulge in this species of gambling in human life, could more easily purchase from embarrassed policy-holders than procure the issue of such policies directly to themselves upon the lives of strangers. "In either case," as observed by a recent author in treating of this subject, "the holder of such policy is interested in the death, rather than the life, of the insured." ' (*Helmetag's Adm'r v. Miller*, 76 Ala. 183, 188, 52 Am. Rep. 316.)" 72 Kan. at 203-04.

Although the *Elison* opinion states strong reasons to negate the trial court's rulings, in our case there was clearly an insurable interest in Darlene's life at the time the policy was taken out.

As was said in *Matthews v. Matthews*, 163 Kan. 755, 762, 186 P.2d 233 (1947): "It is the general rule that the insurer is the only party who can raise the question of the insurable interest, sought to be presented here," relying on 37 C.J. 398 and 44 C.J.S. 915. Additionally, Couch on Insurance 3D § 41:23, 41-43 (1998), citing *Sinclair Refining Co. v. Long*, 139 Kan. 632, 32 P.2d 464 (1934), states: "[I]t is generally sufficient that an insurable interest existed at the inception of the contract, and it is immaterial that such in-

terest ceased prior to the death of the insured unless the contract provides otherwise." There is contrary authority, and the same section of Couch above cited states it has been held that cessation of the interest is fatal to the beneficiary's cause of action. Couch then states: "This point becomes particularly important in the context of term life insurance."

The *Long* case cited in Couch is not directly applicable to our facts, as it involved life insurance purchased for business purposes, but held:

"(1) The corporation had an insurable interest in the life of the insured; (2) the policies were valid when issued; (3) and did not cease to be so because the insured's services with the corporation ceased some months before his death. Further held: Such policies are not indemnifying contracts; neither are they wagering contracts; neither are they void as being against public policy." 139 Kan. 632, Syl. ¶ 1.

We cannot hold that there was not at the beginning of the insurance contract an insurable interest under our facts. We will later discuss the effect of the second sentence of K.S.A. 40-453(a) which we previously set forth.

We agree with Robert's next argument that the trial court erroneously valued the policy on Darlene's life at $100,000 and erred in assigning $50,000 of this value to each of the parties in making the property division. This is directly contrary to the position of both parties who showed zero (0) value on the policies in their submissions of suggested division of assets and liabilities.

In describing term insurance, Holmes' Appleman on Insurance 2D § 1.25, 126-27 (1996), states:

"Term life insurance, unlike whole life insurance and analogous forms, has no cash surrender value or loan value. . . . A true term contract would have no loan or cash value, or, in fact, any value except in the event of the death of the insured prior to the expiration of the contract."

This is not precisely true, for as we will hereafter consider, if Darlene was no longer insurable on an anniversary date of the term contract, some value, although difficult to determine, would in fact exist.

However, under our facts, the parties appear to both have valued the policy on Darlene's life at zero, and since she was alive at the

time of the trial court's ruling, it was erroneous to value the policy in making the property division as if she had died during the pendency of the divorce proceeding. See *Marriage of Robinson*, 570 S.W.2d 320, 322 (Mo. App. 1978), citing Appleman, Insurance Law and Practice § 3 (1941) (a true term contract would have no value except in the event of the death of the insured).

We do not agree with Bonny's argument that it makes no difference whether the policy is valued at zero, $100,000, or $1,000,000, as it distorts the economic situation of the parties and fails to view their situation in its true sense. For example, the trial court, after attributing $50,000 in value of the insurance on Darlene's life to each of the parties, set forth the net value of the property passing to wife as $86,053 and husband as $84,768 although noting this was "contingent upon Darlene's date of death." The actual net of the parties, assuming the validity of all appraisals, was only $34,768 to the husband and $36,053 to the wife.

Robert's final argument is a combination abuse of discretion/ violation of public policy contention that the trial court's order of continuing the policy in effect results in locking him into paying an unknown but increasing amount for an unknown length of time in the face of his testimony that he does not know if he will be able to continue making the required payments. Robert raises a number of unknown possibilities concerning his death, that of Bonny prior to Darlene's, or his disability, but principally he argues the order is against public policy, is an abuse of discretion, and requires the parties to gamble on the extent of the life of a third party.

Darlene objects to her former daughter-in-law, who sued her and brought her into the divorce case, from profiting from her early death.

Bonny's argument centers on the payment of the premiums by their joint assets during the marriage, her interest in the property of the marriage under K.S.A. 2002 Supp. 23-201(b), her contention that Darlene's objection is of no force and effect, and that to not have the right to compel continuation of the policy or policies and receive a benefit therefrom would have been an abuse of the trial court's discretion.

Our research and that of the parties has failed to uncover a similar factual situation either in Kansas or in any other state. All of the cases we have located relate to life insurance on the lives of the husband or the wife and how it should be distributed between the parties at the time of the dissolution of the marriage or the legal effect of change of beneficiary by one spouse and his or her death while the divorce is pending. See, *e.g., Wear v. Mizell,* 263 Kan. 175, 946 P.2d 1363 (1997). A different legal issue is presented when a party fails to change his or her beneficiary designation after a divorce and no specific provision of the settlement agreement or divorce decree relates to beneficiary changes. See *Hollaway v. Selvidge,* 219 Kan. 345, 548 P.2d 835 (1976).

It is interesting to note that in several states, it has been held that term life insurance policies cannot be considered marital property subject to division as they have no present value. *C.M.D. v. J.R.D.,* 710 S.W.2d 474, 477 (Mo. App. 1986); *McGovern v. Broadstreet,* 720 P.2d 589, 590-91 (Colo. App. 1985). A better rule seems to have been espoused in two California cases, *In re Marriage of Gonzalez,* 168 Cal. App. 3d 1021, 1025-27, 214 Cal. Rptr. 634 (1985) (term insurance has value because replacement cost might be significantly higher and insurability might be in issue), and *Estate of Logan,* 191 Cal. App. 3d 319, 325-26, 236 Cal. Rptr. 368 (1987) (term insurance policies typically contain elements of present coverage and right to renew without proof of current insurability, but if insured remains insurable, a term policy does not constitute a divisible community asset since the policy is of no value and the community has fully received what it bargained for).

There is no evidence in our case as to whether Darlene remains insurable, and we must not assume she is or that she is not. An argument could be made that the $10,000 portion of the coverage should be analyzed differently from the $90,000 pure term rider, but again the parties have given us no basis to do so as they have both agreed by their submissions to the trial court to value the policy on Darlene's life as zero. Despite these uncertainties, we must find that the insurance coverage in issue does in fact constitute property within the meaning of K.S.A. 2002 Supp. 60-1610(b).

However, even though we recognize the insurance policy as being "property" subject to the trial court's jurisdiction, there are several basic problems with the trial court's rulings relating to its continuance.

First, it fails to recognize that under the wording of the second sentence of K.S.A. 40-453(a), which we have previously set forth in full, that Darlene has an absolute statutory right to request in writing that "the insurer . . . terminate or nonrenew the insurance applicable to such person's life." While she has not made such a written request, it was argued to the trial court that she had the right to do so.

The legislative history of K.S.A. 40-453, L. 1993 ch. 190, sec. 2, shows the provisions resulted from H.B. 2083 which was originally intended to allow employers to have insurable interests in employees. Minutes of Senate Committee on Financial Institutions and Insurance, March 12, 1993. The House act was amended in conference committee, and the broad language of K.S.A. 40-453(a) resulted. This wording, while upholding Bonny's arguments as to the initial existence of an insurable interest continuing until the time the loss occurs, makes the insurable interest not exist when the insured asks, in writing, for the insurer to terminate or nonrenew the coverage.

The trial court's ruling has the legal effect of making Bonny a beneficiary under the policy notwithstanding stating that it is only ordering Robert to make a payment to Bonny. Kansas appellate courts have always placed substance over form, *Reiter v. City of Beloit*, 263 Kan. 74, 95, 947 P.2d 425 (1997); *Green v. City of Wichita*, 26 Kan. App. 2d 53, 57, 977 P.2d 283, *rev. denied* 267 Kan. 888 (1999), and the effect of the trial court's ruling is to make Bonny a beneficiary of the policy.

It thus appears that recent legislative action shows a public policy contrary to Bonny's arguments. It also shows the futility of the trial court's ruling, as Darlene has an absolute right to require the policy be terminated or nonrenewed.

Additionally, the effect of the trial court's order is to require the continuance of what is in effect a gambling contract on Darlene's life. If Robert is able to pay the greatly increasing premiums (an

issue in serious doubt), Darlene will have to die short of reaching her normal life expectancy in order to benefit both husband and wife. To require the coverage to be continued against Darlene's wishes is against public policy.

Chief Justice Johnston in the *Elison* opinion previously set forth, although discussing insurable interests, made a statement which is equally applicable to our situation when he opined: "[I]nsurance in favor of one . . . who would be interested in his early death— is contrary to good morals and a sound public policy." 72 Kan. at 203.

Anderson on Life Insurance § 12.1, 353-54 (1991), states: "The courts of the American states, however, have generally held, irrespective of statutes that wager policies are contrary to public policy and void."

We hold that requiring Robert to continue the policy or policies of life insurance on his mother is in effect requiring continuance of a wagering contract on her life and is contrary to public policy and constitutes an abuse of discretion. However, if Robert elects to continue the coverage on his mother's life and she does not require the coverage to terminate, the trial court's ruling is to be carried out.

Robert next argues that the trial court erred by attributing to him the ownership of 75 breeding cows as assets, and if so, that this resulted in an improper division of property and debt.

The trial court determined that despite conflicting testimony regarding the cattle, Robert was to be considered in control of or the de facto owner of the 75 cows. The appellate court's function in reviewing a trial court's finding of fact is to determine if that finding is supported by substantial competent evidence. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 747, 27 P.3d 1 (2001). However, the appellate court does not reweigh conflicting evidence or pass on witnesses' credibility. *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 22 P.3d 124 (2001).

The uncontroverted evidence regarding this issue was that two of the parties' sons, Kelly and Dustin, owned 50 of the 75 cows in

question. However, Bonny advanced at trial that Robert was the de facto owner of the cattle or in control of the disposition of the livestock.

First, evidence existed that the sons had not paid for feed or paid rent for use of the pasture. Second, Robert's assets were used as collateral for the financing of the cattle. Bonny testified that if the cattle were sold, the majority of the funds would be used to satisfy Robert's debt. Also, the sons did not initially furnish any funds for the purchase of the cattle. The cattle are not segregated from each other. Robert included all 75 cows in the personal financial statement submitted at his deposition. Finally, much of the money collected from the sale of calves born from the herd had been used as Robert had directed.

From the foregoing, it was reasonable for the court to conclude that Robert was the de facto owner or in control of all 75 cows for the purpose of dividing the parties' assets and debts. This finding was supported by substantial competent evidence. We do not reweigh conflicting testimony. The trial court did not err in its determination regarding the cattle. It follows that no evaluation of the property division is necessary.

Finally, Robert contends the district court erred in its award of maintenance to Bonny, or in the alternative, that he should receive credit for temporary maintenance payments made.

"The trial court has wide discretion regarding spousal maintenance, and a judgment awarding maintenance will not be disturbed absent a clear abuse of discretion. [Citation omitted.]" *In re Estate of Dahlstrom*, 26 Kan. App. 2d 664, 667, 992 P.2d 1256 (1999), *rev. denied* 268 Kan. 887 (2000).

The facts which may be considered in determining the need and amount of maintenance are age of the parties, present and prospective earning capacities, the length of the marriage, the property owned by each party, the parties' needs, the time, source, and manner of acquisition of property, family ties and obligations, and the parties' overall financial situation. *In re Marriage of Sedbrook*, 16 Kan. App. 2d 668, 827 P.2d 1222, *rev. denied* 251 Kan. 938 (1992).

The trial court awarded Bonny 120 months of maintenance at $311 per month. The court primarily based its decision on the imbalance in the parties' earning power, the desire for the parties to maintain similar living standards, and on the fact Bonny had worked the farm and raised the parties' children during the time Robert began working full time outside the farm. The court determined the maintenance amount using the Johnson County guidelines.

The parties in the present case were married more than 28 years. At trial, Bonny was 46 years old, Robert was 47. Both were working full time, but Robert earned approximately twice the amount Bonny earned. Specifically, Bonny earned $18,899 in 2001 compared to Robert's $37,529. Robert also was earning variable income from the farm, or at the very least, receiving tax relief due to loss. The court charged the vast majority of marital debt to Robert, but he was also credited with more than double the marital assets. The property division netted a difference of approximately $1,300 in favor of Bonny.

Bonny testified she took on progressively more work around the farm over the years and in 1992, she took over much of the farming responsibilities in order for Robert to work full time for the telephone company. The end result of the court's maintenance and child support arrangement was that Bonny had approximately $2,150 per month for her and their two minor children to live on and Robert had about $2,700, which Robert admitted at trial "[m]ay not be reasonable." The maintenance award was not an abuse of the trial court's discretion.

Also, Robert's claim that he should receive credit for temporary maintenance paid has no merit. While it is true that a court may not award maintenance for more than 121 months under K.S.A. 2002 Supp. 60-1610(b)(2), that time restraint applies only to each *period* of maintenance awarded, not an aggregate amount of time. It was not an abuse of discretion to deny Robert's claim for credit for temporary maintenance.

Finally, Bonny's motion for attorney fees on appeal is denied.

Affirmed in part and reversed in part.