NOT DESIGNATED FOR PUBLICATION

No. 114,055

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of
KATHY A. IRONS,
*Appellee*,

and

JOHN G. IRONS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; NEIL B. FOTH, judge. Opinion filed July 15, 2016. Affirmed.

*Katie McClaflin*, of Manson Karbank & Burke, of Overland Park, for appellant.

*Michael W. Lucansky*, of Law Office of Michael W. Lucansky, P.A., of Overland Park, for appellee.

Before MALONE, C.J., LEBEN, J., and JOHNSON, S.J.

*Per Curiam*: The district court granted Kathy A. Irons and John G. Irons a divorce and divided their property. John appeals the property division. He contends that the court erred in construing the parties' prenuptial agreement, which error caused the court to divide property that should have been set over to him as his separate property. He next argues that the court erroneously determined that he constructively owned several vehicles, then improperly included those or their values in dividing marital property. Finally, he claims the court erroneously designated the date of its final decision as the property valuation date. Finding no error, we affirm the district court.

1

FACTUAL AND PROCEDURAL BACKGROUND

By early 1989, John and Kathy had been living together in Nebraska for some time and were contemplating marriage. Before any marriage, though, John insisted that they have a prenuptial agreement: he had been married before and, this time, wanted to make sure he would retain his premarital property in case of a divorce. John asked his long-time family attorney, Joe Cariotto (now deceased), to prepare such an agreement. John denied that he gave the attorney instructions on what terms to include in the agreement. Counsel directed the parties to list the assets each party owned and intended to retain as separate property for incorporation into the agreement. The parties each provided a list to counsel. Counsel prepared a prenuptial agreement (Agreement). The Agreement stated that each party possessed property the party desired to keep separate from marital property, which separate properties "have been fully disclosed and set forth in Exhibits 'A' [John's separate property, total value of $338,550] and 'B' [Kathy's separate property, total value of $22,248] attached hereto . . . ." The Agreement further required that Kathy waive any right, ever, to spousal maintenance.

Kathy testified that when she saw John's list she balked, complaining that it listed far more than just the real properties she said John told her he wanted to keep separate. She believed the Agreement to be unfair to her, especially if the parties had children, a long marriage, or both. Nevertheless, the wedding, at which the parties expected 300 guests, was rapidly approaching. Each party signed the Agreement on March 16, 1989. They married 2 days later. The parties lived in and, apparently, improved John's Nebraska farm home (listed in Exhibit A), until they moved to Kansas in 1994. By then the parties had a daughter, born in 1992. Kathy became a stay-at-home mom while John continued to work for Burlington Northern Santa Fe railroad. The parties then had a son, born in 1999. John sold the farm home in 2005 to help the parties acquire a newly built home in Kansas.

Kathy filed a petition for divorce on August 16, 2013. Kathy did not refer to or provide the court with the Agreement. John filed a timely answer and counterpetition seeking a property division consistent with the Agreement, a copy of which he attached to his pleadings. Kathy filed a motion challenging the validity and enforceability of the Agreement. She claimed that the final Agreement included a now-missing sunset clause page which provided that the Agreement would be void if the parties remained married for more than 10 years or upon the birth of the parties' first child. She also claimed that she did not execute the Agreement voluntarily due to her young age and lack of financial experience. She juxtaposed her naiveté to her older husband's business education and savvy, pointed out that the Agreement was drafted by John's attorney, and maintained that the Agreement was unfair both in the property division of listed premarital assets as well as in her waiver of spousal maintenance. John denied all of Kathy's claims.

On February 25, 2014, the district court conducted a hearing on the motion. The court heard extensive testimony from Kathy attacking the Agreement and from John defending it. John explained how he justified the Agreement to Kathy:

> "And, you know, I told her I was, you know, concerned about my assets. I had at that time three houses, two rental properties and a house, and cash and property and other things, and I was concerned about keeping them, so I would want to protect them."

John also explained on cross-examination by Kathy's counsel that he gave no specific instructions to his attorney on what the Agreement should contain:

> "Q. What did you tell him you wanted in a prenuptial agreement?
> "A. I had no idea what was supposed to be in a prenuptial.
> "Q. So Mr. Cariotto just on his own prepared a document with no direction from you?
> "A. Correct."

3

On April 29, 2014, the district court filed its order from that hearing. The court indicated that Kathy's evidence was "strange and contradictory" while some of John's testimony and actions were "suspect." The district court denied Kathy's motion finding that she had failed to sustain her burden of proof. The court held that "[Kathy] is stuck with a very one-sided agreement" and, although the Agreement was not "fair," it was legally permissible under the Kansas Uniform Premarital Agreement Act, K.S.A. 2015 Supp. 23-2401 *et seq*. The court held that the Agreement was valid and enforceable.

As the case worked its way through subsequent discovery and pretrial proceedings John clarified his construction of the Agreement. He contended that he was entitled not just to the property he had listed in his Exhibit A and any additions to that property. Under his reading he also was entitled to other premarital property he "forgot" to list, as well as all the property he had accumulated from his job including his railroad pension, 401(k), stock, etc. He based that claim on various phrases picked from the Agreement, *e.g.*, "said parties desire to keep all of his and her property now owned or hereafter acquired by each of them, free from any claim of each against the other in the event of death, separation or divorce" and "it is the desire and intention of the parties that each shall continue to own separately all of the property real and personal, that each owns at the time of the marriage of the parties to each other or thereafter acquired or coming to them during the marriage."

John insisted that these various phrases operated to expand the nonmarital property coverage of the Agreement beyond just those items listed in Exhibits A and B. Kathy cried foul. She maintained that only properties listed in Exhibit A, and additions thereto, were John's separate property under the Agreement, and that the remainder of the parties' property not listed in an exhibit or acquired during the marriage was subject to division.

In its order from a motions hearing held October 16, 2014, the district court held that the Agreement unambiguously provided that the real and personal property identified in Exhibits A and B would remain nonmarital upon divorce, including any increases in the value of listed property. However, regarding John's claims to an entitlement to property not listed in Exhibit A, the court determined that "the agreement is ambiguous as to the marital or nonmarital status upon divorce of assets acquired during the marriage because it contains numerous terms of conflicting or doubtful meaning." After reciting those terms and pointing out their deficiencies, the district court held that the parties could offer parol evidence as to their intent in making the Agreement "in hopes that such testimony can clarify the meaning of these contractual terms."

The district court presided over a 2-day trial. The parties presented evidence regarding their intent in making the Agreement, property division, and other aspects of the divorce not relevant on appeal. The court issued a memorandum decision on April 8, 2015. The court concluded that only the items in Exhibits A and B of the Agreement would remain separate property, along with any "increases in the value of said property, however occurring."

The district court soundly rejected John's interpretation of the Agreement. It found that the parties had not agreed to that interpretation when they made the Agreement. It noted that the provisions on which John relied were at best ambiguous with regard to the determination of what was separate or marital property upon divorce. The court held:

> "In this case the Court finds that the parties could not have intended to contract for an outcome so obscured and unpredictable at the time of execution as to be meaningless. Husband's claimed contractual intent and terms are never actually set forth, they must be inferred from the totality of the language. The agreement does not contain any language about the meaning or importance of unlisted or future assets being held individually or jointly. Carried to its logical conclusion, husband's claimed contractual intent and meaning yields something far short of a contract. . . . While only reasonable

5

certainty is required in a purported contract, if the terms are so vague and indefinite that the intentions of the parties cannot be ascertained, it is unenforceable. *Richards Aircraft Sales, Inc. v. Vaughn*, 203 Kan. 967[, 457 P.2d 691] (1969)."

The court also held that the parol evidence it considered was of no help to John:

"[T]he parol evidence at trial and in previous hearings, taken as a whole, does not resolve ambiguous terms of the contract in husband's favor. *It does not establish an intent by the parties to contract for husband's proposed definition of separate property. Rather, the evidence establishes that it was much more likely the parties intended to exclude from division upon divorce those items that they listed as premarital in the prenuptial agreement Exhibits A and B, along with growth and additions thereto or income therefrom.*" (Emphasis added.)

The district court divided the property of the parties consistent with its reading of the Agreement. Specifically it awarded John his rental properties and an allocation from the sale proceeds of the parties' Kansas home to restore to him funds he had invested in it attributable to sale of his Nebraska farm home. John timely appeals from that property division.

ANALYSIS

On appeal, John challenges the district court's (1) interpretation of the Agreement, (2) its inclusion of certain vehicles in the marital estate it held were constructively owned by John, and (3) its use of the date it issued its written decision for the date of valuation of property. We will address these claims in the order John briefed them.

*The district court did not err when it rejected John's reading of the Agreement*

The district court determined that the only separate properties reserved to a party by the Agreement were the properties listed in its Exhibits A and B, "along with growth

6

and additions thereto or income therefrom." It appears that the district court disregarded as ambiguities never agreed upon the various phrases on which John relied to establish his claim to both premarital but unlisted property and postmarital benefits and acquisitions. John argues that the district court erred in its interpretation of the Agreement. He claims that parol evidence was unnecessary because the Agreement unambiguously states that any property he acquired in his own name, whether before or during the marriage, regardless of his list in Exhibit A, is his separate property upon divorce. We agree the Agreement is unambiguous. However, we reject John's reading of the Agreement because it is unreasonable, contrary to common sense, and, as the district court pointed out, it results in absurdities. And, even if the poorly drafted phrases he relies on are ambiguities, he has failed to prove that the parties initially or ever mutually intended to make the contract he asserts.

*Standard of review and guiding principles*

The legal effect of a written instrument is a question of law. We may construe the Agreement and determine its legal effect regardless of the construction made by the district court. *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011). When interpreting written contracts, the primary rule of construction is to ascertain the parties' intent. If the terms of the contract are unambiguous, the parties' intent is to be ascertained from the contract language without applying rules of construction. See *Waste Connections of Kansas, Inc. v. Ritchie Corp*., 296 Kan. 943, 963, 298 P.3d 250 (2013).

The question of whether a written instrument is ambiguous is a question of law subject to our unlimited review. *Waste Connections of Kansas, Inc*., 296 Kan. at 964. A written instrument will not be found to be ambiguous unless two or more meanings can reasonably be construed from the contract. *Iron Mound v. Nueterra Healthcare Management*, 298 Kan. 412, 418, 313 P.3d 808 (2013). The court will not strain to find an ambiguity where, in common sense, there is none. *American Family Mut. Ins. Co. v.*

7

*Wilkins*, 285 Kan. 1054, 1059, 179 P.3d 1104 (2008). Additionally, an interpretation of a contractual provision should not be reached merely by isolating that particular provision but, rather, by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. *Waste Connections of Kansas, Inc.*, 296 Kan. at 963. A contract provision is not ambiguous merely because the parties disagree over its meaning. See *ARY Jewelers v. Krigel*, 277 Kan. 27, 34-35, 82 P.3d 460 (2003).

*Discussion*

We agree with the district court that the Agreement is, in places, poorly drafted. However, a document that contains poorly drafted phrases is not automatically ambiguous. During our review of John's arguments we must focus on the individual phrases, sentences, or provisions he attempts to exploit, but we reach our conclusions after considering the entire document from its four corners. We have considered the entire Agreement and conclude that it is not actually ambiguous. We set out below several relevant provisions including those on which John bases his current interpretation. The parts in bold are bolded in John's brief to emphasize his contentions.

As drafted by John's attorney, the cornerstone of the Agreement is in its third paragraph (the first two date the agreement, identify the parties, and recognize that the parties expect soon to be married which would otherwise affect their property rights):

> "WHEREAS the parties are now the owners in their own right of real estate and personal property which have been fully disclosed and set forth in Exhibits A and B attached hereto and made part hereof and the **said parties desire to keep all of his and her property now owned or hereafter acquired by each of them, free from any claim of each against the other in the event of death, separation or divorce, one from the other, otherwise acquired by reason of the marriage or by reason of surviving him**

8

**or her as widow or widower or by reason of separation or divorce,** one from the other, and . . . ."

In this paragraph the parties initially acknowledge (1) they each own property (2) which each has fully disclosed to the other (3) by listing that property in their respective exhibits (4) and which each party desires to own separately. John argues that the bolded text was not intended to be read in the context of the initial phrase. He claims it creates a new category of property for each party, *i.e.*, property owned that, in spite of the full disclosure promised, a party did not disclose by listing it, as well as any property a party later acquires at any time. But the bolded text must be read in context. In light of the whole Agreement, John's reading is unreasonable. It renders meaningless the promise of full disclosure and the explicit requirement that a party list property intended to be separate. The bolded text John relies on merely explains that the listed property and any accretions to that property remain the separate property of the one who listed it.

Another recital states:

"WHEREAS, it is the desire and intention of the parties that **each shall continue to own separately all of the property real and personal, that each owns at the time of the marriage of the parties to each other or thereafter acquired or coming to them during the marriage**."

John argues that the bolded provision should be read with no reference to disclosure or exhibit listing. He uses this to justify his claims to premarital property he "forgot" to list and to what he "acquired" from his employment during the marriage. Again, in the context of the Agreement, this reading is unreasonable. It ignores "continue to own" as the antecedent to the property described, as well as the disclosure and listing requirements. The bolded text simply reiterates the intention that listed, separate property the parties "continue to own" remains separate property, along with any accretions.

9

Next we set out numbered provisions from the Agreement. The bolding again is from John's brief.

"1. That each of the parties hereto shall retain the title, ownership, management, possession and control of the estates now owned by each, real, personal or mixed, and all reinvestments, increases, accumulations or additions thereto entirely free and unmolested by the other party and each party may encumber, sell, give or provide by Will for the disposition of any or all of said estate so separately owned and possessed. That **upon the death, divorce or separation of the parties, no claim of any kind shall be made by either of the parties against the estate of the other** except as provided in paragraph 5 of this agreement.

"2. Kathy Ann Miller [Irons] hereby **waives and relinquishes** all of her rights of dower, statutory allowances, temporary or permanent support or separate maintenance **in the event** of divorce or separation of the parties and in lieu of distribution in intestacy of election to take against the Will of John G. Irons, widow's allowance, right of inheritance and **all other marital rights which she will acquire by reason of her marriage** to John G. Irons in any and all property, real and personal, **owned by him at any time** or by his estate upon his death except as provided in paragraph number 5 of this agreement."

Although John's brief does not separately set out paragraph 4 of the agreement, his argument attempts to distinguish it. This paragraph clearly limits separate property to what is "now owned" and accretions. We have emphasized the part he distinguishes:

"4. *Each party does hereby consent and agree that each party shall have full power and control and in all respects to exercise free and undisturbed ownership, management, and disposition of the property and estate now owned and possessed by said parties and increases and accumulations thereto*. Each party consents that the estate of each shall be disposed of by his or her Will or if there shall be no Will, then his or her estate shall descend to the heirs, legatees, devisees of the deceased party as provided by law, free and clear of any claim by or for inheritance, dower, curtesy, maintenance or other claim or right given by law to a surviving husband or wife in the estate of the deceased, unless otherwise provided herein." (Emphasis added).

10

Paragraph 5 limits Kathy's inheritance from John's separate estate to $10,000.

Finally, we include the second key provision of the Agreement concerning the establishment of separate property. It implements the cornerstone of the Agreement, *i.e.*, the "Whereas" recital providing that the parties, after full disclosure, have listed in Exhibits A and B the property they intend to remain separate after the marriage:

"6. It is further agreed that *under the provisions of this agreement each party shall have the right to give, grant and dispose of his or her property which he or she now has as herein set forth in Exhibit 'A' and 'B' or any party hereof and any and all accumulations and increases therefrom as he or she shall see fit to do in his or her lifetime* and he or she shall have the right to make such Will, gift, conveyances, mortgage or other writing as he or she may desire . . . ." (Emphasis added.)

Parsing paragraph 6 is not complicated. It clearly states that it governs the "provisions" of the Agreement. It applies, then, to all provisions. It limits the property a party is free to dispose of after the marriage to property the party "now has" so long as that property has been listed in an exhibit. This paragraph is clearly intended to be read with and to implement the purpose statement for the Agreement contained in the above-cited third "Whereas" recital. Thus, for the purposes of the agreement, the only separate property the Agreement provides for is that owned by either party that has been "fully disclosed and set forth in Exhibits A and B" and any accumulations or acquisitions "therefrom" that accrete from such listed separate property.

All of the language John relies on to read out of existence the separate property limitations in the above whereas provision and paragraph 6 must be read in light of the limitations in those provisions. Thus, "the estates now owned by each, real, personal or mixed, and all reinvestments, accumulations or additions thereto" does not expand the estates beyond those listed in the exhibits; it clearly refers just those estates listed. Likewise, "said estate so separately owned and possessed" again means only the separate

11

estate that has been listed. The same limitation applies to "the property and estate now owned and possessed by said parties and increases and accumulations thereto" and "in any and all property, real and personal, owned by him at any time." The phrases on which John incorrectly bases his separate property claims are just reiterations of the limits on separate property established in the third "Whereas" provision and paragraph 6.

We have reviewed, in the context of the entire Agreement, all of its provisions in order to determine the parties' intent. See *Waste Connections of Kansas, Inc.*, 296 Kan. at 963. We have construed all of the Agreement's provisions together and in harmony rather than in isolation. See *Osterhaus*, 291 Kan. at 778. Each of the provisions principally describes property owned before the marriage—describing it either as property "now owned" or property "set forth in Exhibits 'A' and 'B.'" Each description then provides for supplementation of the premarital property by including some combination of the following: "reinvestments," "accumulations," "acquired," "increases," or "additions." Importantly, these descriptions generally tie such accretions to listed premarital property in that they are modifications "thereto" or "therefrom." Taking the provisions of the Agreement together, and reading them reasonably and with common sense, the intent of the parties is clear: they intended that a party's separate estate consist only of the premarital property recorded in the party's exhibit and any accretions to that listed property. See *Waste Connections of Kansas, Inc.*, 296 Kan. at 963.

John argues that "acquired" and "increases and accumulations thereto" should be read to include any property acquired during the marriage that a party comes into in his or her sole name. But this reading stretches the meaning of the words beyond their natural interpretation in this context. See *Boos v. National Fed'n of State High School Ass'ns*, 20 Kan. App. 2d 517, 524, 889 P.2d 797 (1995) ("The plain and simple fact is there is a complete absence of any language in the agreement which supports [appellant's] contention . . . . The rule is clear that unambiguous contracts must be enforced according to their plain, general, and common meaning in order to ensure the intentions of the

12

parties are enforced."). Again, John's relied-on language does not create a new class of separate property, it merely refers back to that property made separate by a listing on an exhibit. We decline to add words to the Agreement that would impart an intent that was wholly unexpressed when it was executed. See *Quenzer v. Quenzer*, 225 Kan. 83, 85, 587 P.2d 880 (1978). None of the provisions in the Agreement refer specifically to property acquired during the marriage that is not connected to the parties' listed premarital property. John has provided us with no justification to add such language to the provisions. See *Duffen v. Patrick*, 212 Kan. 772, 778, 512 P.2d 442 (1973).

We are persuaded that the district court raised in its decision the correct questions in the following:

> "A common sense analysis of wife's circumstances at the time of execution also cuts against her having the contractual intent husband suggests. How could wife have possibly known at the time of execution that husband's property or 'estates now owned' or 'separate property' upon divorce might ultimately be defined by a court as accounts *in existence, but not listed by husband*, at the time of execution? How can this Court constructively add such accounts to the parties' lists? If that was actually husband's contractual intent, *then attorney Carrioto's whole exercise of having his client and prospective wife prepare their respective lists of premarital property was at best meaningless and at worst a diversionary tactic designed to obscure from wife the largest consequence of her signature. She would naturally think that the lists had meaning*." (Emphasis added.)

We agree with John that the Agreement is unambiguous. However, we disagree that it says what he claims it does. A contractual provision is not ambiguous merely because the parties disagree over its meaning. *Krigel*, 277 Kan. at 34-35. Having reviewed the four corners of the document, we are confident that we have gleaned the parties' mutual intent at the time they made the Agreement: they intended that properties listed in the Agreement's exhibits remain the separate property of the listing party. The

13

parties did not intend to make any property acquired by either party during their marriage nonmarital property other than accretions to listed property. Nor did they intend to provide that property a party owned at the time of the Agreement but forgot to list in the exhibit was nevertheless nonmarital. The law favors reasonable interpretations, and this interpretation is reasonable. John's reading of the Agreement would vitiate the stated purpose of the terms of the Agreement to an absurdity. *Waste Connections of Kansas, Inc.*, 296 Kan. at 963. We affirm the district court's conclusion in construing the Agreement, albeit for a different reason. The district court did not err when it treated as marital property and divided both John's unlisted premarital property and the postmarital assets and interests he acquired as a result of his employment.

Even if we determined that the phrases John relies on were ambiguities rather than simple reiterations, we would reach the same result. When a contract is determined to be ambiguous, parol evidence may be considered to aid the court's interpretation of an agreement to determine the parties' intent. *Central Natural Resources v. Davis Operating Co.*, 288 Kan. 234, 245, 201 P.3d 680 (2009). We have reviewed the parol evidence adduced in the district court over the course of the hearings and trial. It does not indicate that the parties intended their separate estates to include anything other than the premarital property they listed in their exhibits. We, as did the district court, conclude that the parties had no meaningful understanding of the provisions of the Agreement prior to its signing. John testified that he was concerned about his premarital property, including his rental properties and houses. He asked his attorney to draft a premarital agreement. He stated that he had "no idea what was supposed to be in a prenuptial," so he had his attorney prepare a document on his own with no direction from John.

The evidence indicated that during their 24-year marriage, John and Kathy did not treat any of John's benefits from his railroad employment or any of his listed property interests, other than the farm and his rental properties, as John's separate property. This suggests that they did not regard those assets as separate. The parties operated their

14

financial accounts jointly and filed their tax returns jointly. They comingled their incomes and income tax refunds as well as John's bonuses and stock liquidations. "If parties to a contract, subsequent to its execution, have shown by their conduct that they have placed a common interpretation on the contract, this interpretation will be given great weight in determining the meaning to be attributed to the provisions in question." *Cline v. Angle*, 216 Kan. 328, Syl. ¶ 6, 532 P.2d 1093 (1975). We agree that, as the district court found, there was "no convincing testimony at trial as to any discussion between the parties regarding their intent as to unlisted but pre-existing property, after-acquired property, or how income would be handled."

"In order to form a binding contract there must be a meeting of the minds on all the essential elements. [Citation omitted.]" *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012). The parol evidence of the parties' intent in this case fails to show that John and Kathy had a meeting of the minds that John's marital income, all of his railroad benefits, and all of his unlisted premarital property would be treated as his separate property. Thus, even if we were to find ambiguities and consider parol evidence, we would still conclude that the sole agreement the parties designated as separate, nonmarital property only the premarital property listed in Exhibits A and B, and any accretions to that listed property consistent with the operative language of the Agreement. And, in that circumstance, we would affirm the district court for the same reasons it cited.

Finally, John contends that Kathy was estopped from challenging John's reading of the Agreement because, by signing the Agreement, she induced him to marry her to his eventual financial detriment. We see that John raised this defense in his posttrial brief. However, the district court did not refer to it in its memorandum decision, and the record on appeal does not show that John objected. A party must object to inadequate findings of fact and conclusions of law to preserve an issue for appeal. See *Fischer v. State*, 296 Kan. 808, 825, 295 P.3d 560 (2013). When no objection is made to a district court's inadequate findings of fact or conclusions of law, an appellate court can presume the district court

15

found all facts necessary to support its judgment. See *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 361, 277 P.3d 1062 (2012). We apply that presumption and decline to separately address this issue.

*The district court did not err in finding that John constructively owned four vehicles*

The district court included in its property division four vehicles: a 2012 Toyota Prius, a 2002 Buick Century, a 2002 Subaru Forrester, and a 1999 Kawasaki motorcycle. John argues that the vehicles are titled in the name of J and R Motors, a car dealership he acknowledged he works with owned by his nephew, and thus they were never marital property. The district court found that John "enjoys the use and constructive ownership of these vehicles" and therefore included them in the marital estate.

A Kansas court has the power to divide assets upon divorce that it finds to be constructively owned by a party. See *In re Marriage of Day*, 31 Kan. App. 2d 746, 757, 74 P.3d 46 (2003). In *Day*, the husband argued that the court erroneously found he was the de facto owner of 75 breeding cows and thus improperly awarded those cows to him upon divorce. The uncontroverted testimony in that case was that 50 of the cows were owned by two of the couple's sons. Nevertheless, this court held that sufficient evidence supported the district court's inclusion of the cows for division because the husband exercised ownership of the cows: he paid for their feed, he pastured the cows, his assets were used as collateral for financing the purchase of the cows, and he collected the money from the sale of calves born from the herd, among other indices of ownership. 31 Kan. App. 2d at 758.

The question, then, is whether substantial competent evidence supports the district court's finding of John's constructive ownership of the vehicles. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to

16

support a conclusion. We do not reweigh conflicting evidence or pass on witnesses' credibility. *Cresto v. Cresto*, 302 Kan. 820, 835, 358 P.3d 831 (2015).

As in *In re Marriage of Day*, there is substantial competent evidence that John constructively owned the vehicles at issue. The testimony at trial was that the 2012 Prius and the Kawasaki motorcycle had dealer tags and the Forrester did not have tags at all. Despite how the vehicles were titled and tagged, the evidence supports the district court's finding because John used the vehicles personally or for his family and he oversaw repairs and work on the vehicles.

The 2012 Toyota Prius and 2002 Buick Century were treated as family vehicles. John testified that the Prius was the car he normally drove. He insured the car and put new tires on it at his own expense. He made a claim regarding the Prius to the Kansas Insurance Department in his name, not in J and R Motors' name. While the Prius had a salvage title, John testified that he planned to purchase the car and title it in his name with postdivorce proceeds. Similarly, John acquired the Century for the parties' son, Nick. He and Nick had been fixing the car up together. John testified at trial that he planned to purchase the Century for Nick when Nick was old enough to drive. Reasonable persons could find this evidence sufficient to support a finding that John was the constructive owner of the Prius and the Century for his personal and family use.

The testimony is less clear regarding the 2002 Subaru Forrester and the 1999 Kawasaki motorcycle. Both vehicles had salvage titles held by J and R Motors. John had not paid for them yet. John testified that he acquired both vehicles after the petition for divorce was filed. Both were kept at the parties' marital residence. Kathy testified that John drove the Forrester as his daily vehicle before he acquired the Prius and that he continued to keep the Forrester at the residence. She presented evidence that he paid for work on the Forrester. Kathy testified that John drove the motorcycle occasionally for personal use. John admitted that he repaired at least one part on the motorcycle. Based on

17

evidence of John's exercise of control over and use of the vehicles, the district court's determination that he was the constructive owner of the vehicles is supported by substantial competent evidence. The district court did not abuse its discretion when it included the vehicles as marital property and set them over to John.

*The district court did not err when it set the valuation date as the date it issued its memorandum decision*

On April 8, 2015, the district court issued its memorandum decision, in which it interpreted the Agreement and divided the marital property between the parties. It selected the date for valuation of the marital assets as the date the decision was issued. John argues this was an abuse of discretion and asks that we remand this issue to the district court to set the valuation date as the date of filing or the date the court heard the trial evidence. He contends that, because he continued to pay the mortgage and expenses on the marital home during the pendency of the divorce, he increased the parties' equity in the home without a concomitant benefit under the division of the home equity.

John's brief does not set out any calculation of the loss he claims he suffered. He equates his house payments to payments of spousal maintenance, maintenance which Kathy waived in their Agreement. This is a questionable contention: the record indicates that the parties jointly occupied the home during the pendency of the divorce. It further indicates that the district court was fully aware of the debt service required to stay current on the home loan. John was not paying separate child support. It is not clear to us that the district court failed to take all this into account when it made its property division orders.

At any rate, a district court has wide discretion to set the valuation date based on the circumstances of the case. We employ an abuse of discretion standard when reviewing a district court's selection of a valuation date for marital property. *In re Marriage of Cray*, 254 Kan. 376, 387, 867 P.2d 291 (1994). "A judicial action constitutes

18

an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. [Citation omitted.] The party asserting an abuse of discretion bears the burden of showing such an abuse of discretion. [Citation omitted.]" *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 134 S. Ct. 162 (2013).

There is no specific date a district court must select for valuation of the parties' assets. Under the current statute a district court has wide discretion to select a date on which the value of marital assets shall be set. K.S.A. 2015 Supp. 23-2802(b) provides:

> "Upon request, the trial court shall set a valuation date to be used for all assets at trial, which may be the date of separation, filing or trial as the facts and circumstances of the case may dictate. The trial court may consider evidence regarding changes in value of various assets before and after the valuation date in making the division of property."

The district court set the valuation date on the date it concluded the trial by issuing its decision. It chose the date based on evidence that the parties continued to live together in the marital home for the entire time this action was pending in the district court. By court order, the parties continued to pay the monthly household expenses as they had historically paid those expenses. Kathy was not receiving any separate child support. The court divided the marital equity in the residence and all other property as of the date it established, then divided, the marital estate. "'[T]he precise date upon which any marriage irretrievably breaks down is extremely difficult to determine.'" *In re Marriage of Cray*, 254 Kan. at 386 (quoting *Berish v. Berish*, 69 Ohio St. 2d 318, 320, 432 N.E.2d 183 [1982].) In fact, to ameliorate the difficulty identified above in *Cray* the legislature amended the statute (now K.S.A. 2015 Supp. 23-2802[b]) by adding its last sentence to add flexibility on the establishment of the valuation date.

Reasonable persons could agree that the valuation date set here was appropriate under K.S.A. 2015 Supp. 23-2802(b) and the facts in this case. John has failed to demonstrate that the district court's choice of a valuation date constituted an abuse of discretion.

Affirmed.